Turn to the next case on our calendar, which is United States v. Orane Nelson. Good morning, your honors. Good morning. Marshall Mintz appearing on behalf of Orane Nelson. This is a case that resulted from a cascading series of errors at every stage of the proceedings that began in discovery and continued all the way up to the government's rebuttal summation. Two of the errors that loom large in this case both involve a witness by the name of Guillermo Ortiz. The first of those would be the failure to disclose Brady information. And the second would be the impermissible introduction of evidence of a death threat against the witness. Just so I'm clear, because there are a lot of claims here, the Ortiz material you didn't get in a timely manner was five days before trial, right? And the government says 11 days before cross-examination? Between three and five days before trial. I think what I tried to explain in my reply brief is I can only go off the date that was marked on the CDs themselves in Magic Marker. I don't know when the defense picked them up. One of the CDs, I believe the second one was actually, it looks like it was created at 1131 at night. So I think that was the one that was created on the 18th. Usually with disclosures, if there's a problem with their timeliness, we look to whether there was a request for more time sought, which I did not see. Is that correct? Correct. All right. And so given that no more time was sought, why should we be concerned here? You should be concerned because . . . I would say the reason that no time was sought is on this record, when you look at the record, there is no indication that defense counsel was even aware that these materials existed because of the late disclosure. Specifically, prior to . . . No sense that they . . . no awareness before they were disclosed, or is it a problem after disclosure? Afterwards. And after disclosure, you're saying there wasn't enough time to review them, or what? Correct. Well, you see, that's where the failure to ask for more time comes in, because one would think that if counsel didn't have a chance to review them . . . you know, whether we view this as Brady, because you say it fits under Giglio impeachment, or 3500. I mean, 3500 is turned over because there may be impeachment material, there may be inconsistencies in prior statements. If defense counsel hasn't had an opportunity to review them, one would expect that there would be a request for more time. Why not? Well, defense counsel specifically asked for Brady on this witness, I think, two months earlier, and the government's response was . . . I understand that. Right. So at the time that the government hands over the 3500, my reading of the record says that defense counsel focused on things like prior testimony, and there are comments that the government refers to and says, look, they obviously saw all the 3500. But it's not all the 3500. The comments the government is talking about seem to indicate that defense counsel may have looked at the index, just to see whose name was listed, and then gone to, for the cooperators, the prior testimony that they had given in a different proceeding. So . . . What's the complaint? Try and explain to us. Sure. So the complaint is that Guillermo Ortiz is critical to the government's case for two reasons. One, he provides the only evidence, completely uncorroborated, that the victim ever threatened my client. The second thing that he provides, also uncorroborated, is evidence that my client apparently called and threatened him after the murders. So the complaint is that the fact that Ortiz gives a statement to the police the day after the murders, he voluntarily goes to the NYPD and gives them a statement which is completely at odds with what he testifies about at trial. What was the statement at all? The statement he gave to police was that Ortiz was in the car with Jason, the victim, the day before the murder, when my client approached, Jason got out of the back into the truck, said to Ortiz, Nelson will call me later about paying the money. And that was it. And then Ortiz also said he's not going to provide any further information to law enforcement. There's nothing there about a confrontation, nothing about Jason making a threat to my client. What he testifies to at trial is not contradictory, it's just more fulsome? What he testified to at trial contradicts that to the extent that it is much more inculpatory to my client. In other words, he testifies at trial about this threat, you know, that Jason made a threat. But that change in story only comes about after he's arrested. So for the jury not to know, two things, one, that he initially gives this statement which says that he was in the car with Jason when my client approached, and then at trial says, no, no, I was around the corner. Two, at trial he says that Jason's girlfriend, Jasmine Guzman, was in the car. Well, her statements, first, he never says anything about her when he speaks to the NYPD. Her statements say nothing about her. She says that she didn't even get there until an hour later, doesn't remember seeing Ortiz that day, and her timeline is actually backed up by the cell site information, which shows, appears to show my client and Jason crossing paths that day at about 4.15, I believe it is. Guzman says she gets there at 6. So that would actually match up with her version, which is that she wasn't there, in which case he's lying about that too. Well, what's that got to do with anything? What does that make, whether she was there? Because if she wasn't there, he's lying. Well, not necessarily. He might just be mistaken. It's not an inculpatory thing, whether she was there or not. It's an incidental detail, like whether a car that passed was red or blue. This meeting cannot be considered incidental because this is the absolute, this is what the government argued was the motive for this crime through the They even said that this murder was a direct response by the threat from Jason to Nelson, and that conversation is the threat. Was Ortiz cross-examined on these inconsistencies? No. This all seems to me to come, excuse me. Oh, no. Why? He had the material. Because he got the material too late? My belief is that he got the material so late and with so much other material that they didn't even read it, and they didn't know it was there. That all comes back to Judge Radji's question. You haven't answered satisfactorily Judge Radji's question. If you were snowed under by a huge 3500 delivery, the thing you must do is go to the district judge and say, Judge, they've overwhelmed us with all this stuff. We need to have time to look at it. None of that was said, and the government says this is grossly exaggerated. What was given to them, the volumes, first of all, consisted primarily of stuff that had already been disclosed long ago. The stuff was well organized, neatly organized. They had plenty of time to look at it, and they never complained about this until now. So why doesn't that, as Judge Radji says, answer the question? Because that assumes that defense counsel knew that there was something there they needed more time to look at. No, it doesn't. It just assumes that they have more stuff. It just assumes that what you're saying is true, that they were so overwhelmed that they didn't have the opportunity to look at it. Your Honor, I understand what you're saying, but I think that my position is that that does the same thing that the government is doing, which is blame the defense, blame defense counsel, for not knowing that this information was there and looking at it and getting it ready for the trial. Am I . . . But, you know, we have some precedent that does suggest that when what we're talking about is giglio material rather than out-and-out exculpatory Brady, the disclosure with 3500 material can often be satisfactory. And so, in light of that, when you get it five days before trial or however many days certainly before cross-examination, and if you don't have enough time to look at it, a court would expect you to say, Judge, I need more time. And if that's not said, the court would have every reason to think, you're ready to go ahead. And so, in that sense, it comes close to being a forfeiture when you don't say, not I haven't gotten it, but I haven't gotten it in time to review it. So I think we're having trouble understanding why there's a true deprivation here. Well, so my time is longer. You're not saying you didn't get the material. You're saying you didn't get it in enough time, but that was never raised in the district court. So there's two things to look at there. And the first question is, first we have to say that this falls under Brady. I believe it does, clearly. If it falls under Brady, then it has to be disclosed in time for effective use. That was diminished from the moment that the government responded to my client's motion two months earlier and said, please give us the Brady material on this particular witness . . . No, it's not in enough time for use if what you haven't been able to do is review it and you haven't spoken up about it. That seems to forfeit the point. Well, there's never . . . that I'm aware of, there's never been a case that says the Brady error can be forfeited like that. But we're not talking about nondisclosure. We're talking about timely disclosure. And you didn't say anything about I need more time. Well, it wasn't me, Your Honor. No, I understand. Well, but I think it's an important . . . that's an important point because . . . And we also don't have anything from trial counsel that says that he didn't have enough time to review it, do we? Well, what I can tell you is when I was brought into this case, the first thing I did was start going through all the material. And when I saw this issue, I called defense counsel and I asked him if what I'm seeing is correct, am I missing something? Nothing that he said to me made me believe that he was aware. I understand. I'm simply saying that when he asked for Brady material on this gentleman and the government said there is none, if the court reaches my first point and says, okay, these documents fall under Brady, then from that moment of the response to the eliminate motion, he was entitled to rely on that as a representation that this did not exist. I mean, that's the Bagley case says that. So when he then gets the 3500, there's no reason for him to think that there should be any extremely impeaching material in there. So he would just go about it as normal, read the prior testimony and his cross-examination was all boilerplate. I don't know a defense attorney who wouldn't read a document that was a prior statement that the witness gave to the police. Do you? No, I don't. I never saw that on the trial court, that a defense attorney didn't cross-examine with respect to a prior statement to the police. All I know is that the cross-examination in this case was absolutely boilerplate. Absolutely what? Boilerplate. There was nothing specific to these documents. It was, you know, have you lied before? You know, you're trying to get a benefit under a cooperation agreement, et cetera, et cetera. Not . . . Not about a previous statement? Nothing about a previous statement to the police that he . . . You're asking us to assume without any basis in the record that defense counsel didn't do their job. I'm asking you to look at this record and say that this entire conviction is based on assumptions, based on assumptions, based on assumptions, and I just don't think it stands up to due process when you look at all these errors in conjunction. Thank you. Thank you, counsel. You've reserved some time for rebuttal. Reserve three minutes for rebuttal. We'll hear from the government. May it please the court, my name is Jared Leno. I'm an assistant United States attorney in the Southern District of New York. I represent the government in this appeal as I did at trial. If I could . . . Counsel, your response in your briefs to these arguments of Brady failure and other prosecutorial errors is that there was overwhelming guilt of Mr. Nelson. Can you just take that off before we go further? Yes, Judge, I'd be happy to. And just to be clear, it's two points. One is that it was disclosed, obviously. The second point, though, is also the materiality point. I think, Your Honors, the materiality point is what you're asking me to address? Well, you tell us in your brief that no matter what happened at the trial, there was overwhelming guilt that the jury could have found and did find that Mr. Nelson committed these murders. Yes, Your Honor. So point one, the first point you make is this material was disclosed and the record indicates that it was in fact reviewed by defense counsel, so there was no disclosure failure. The second point we make concerns the relative role of this allegedly suppressed evidence, which was produced, to the rest of the case. The primary, the core evidence on the murder in this case was electronic evidence, security camera video, cell site location information, and call records, as well as a different cooperator, Sambula, who identified the defendant in the security video. So we tack through kind of a brief timeline of what that evidence showed. So the first piece, and the timeline I'm going to lay out is all within a very short window, a 45-minute period. It starts about 45 minutes before the murder. So what we see here, point one . . . I want to follow you. Is this the part of your brief at page 17 and 18, not where you argue that there was overwhelming evidence of guilt, but that there was ample additional impeachment material for Ortiz? Is that the point you're making here? No. No, Judge. That's a separate point, which I'm happy to address. You're talking about the video that shows even the bullet tracings. Yes, Your Honor. And I think our brief addresses this in two areas. One is in our summary of the facts. First, our factual summary first talks about the drug dealing preceding this murder. Then we talk about this kind of altercation the day before the murder. And the last section of our factual summary describes the actual evidence of the murder, which I'm sure the Court noticed really relied almost entirely on call records, security video, and the cell site location information. We also address these facts in our discussion of the materiality of Guillermo Ortiz's testimony in relation to the other evidence in the case, also in that kind of subsection of the brief. And here's just kind of a very short kind of shell of what that evidence showed. So first, at 1130, about 45 minutes before the murder, there's calls between Nelson and the victim Rivera. They call each other, and they're in different parts of the Bronx from the location information. They then, after those exchange of calls, and by the way, this is the only person in the hour and a half before the murder that the victim Rivera is talking to, they then proceed to the same location in the Bronx, and their location overlaps. They're in separate places. They go to the same location after calling each other. Then they proceed together to the murder location. So that's the first point, is that the evidence shows they met up late at night and then proceeded to the murder location together. You had video of the murder location, didn't you? Exactly, Judge. Exactly. And that's kind of one of the next pieces of the puzzle. There's also the statements from Sandy Rivera, which are the discussion of some length in the briefing, where Jason Rivera told Sandy Rivera, his family member, we are going to go pick up money, debt money, from a maze, which is Nelson. So we know that this meeting is happening, and they all proceed to the murder location together. Then there is actually video of the murder. The murder occurs within a vehicle. While it's still moving, there's a car crash. Two men run out. From that video, you can see the murderer running away from the murder scene. Now this ties up with two other critical pieces of evidence. Identify, recognize, and identify? The quality of the video, it's a little grainy. So I think a layperson looking at the two, you can tell that, let me kind of break it down a bit. You can see the murderer running away. He turns a corner, stops, and looks up at a camera. It is a grainy video, but you can tell he has a beard. You can see his body shape. You can see his general facial features. Now there's two pieces of evidence that are critically, that need to be considered, that evidence that are critically important. One is, cooperator Jonathan Sambula, who is a different cooperator than is at issue with these alleged suppression issues, was the primary drug supplier of Nelson. They were close friends. They had been such for two years. He was able to look at that video, see the gait of the murderer walking away, see his face, see his body shape, and identify with certainty that that was the defendant. The murderer was the defendant. That's the first piece of critical evidence about the video. The second piece is the FBI actually sent one of their expert cell site technicians out to drive the unique path that the murderer ran in the video. There were 10, 11, 12, approximately, different security videos that kind of line the path, the escape route that the murderer took. You're able to see, basically for 10 minutes after the murder, where he runs. Not because they traced his phone, correct? It started with the video, actually, Your Honor. The NYPD fanned out, collected a bunch of security video. The jury knew the path and the FBI knew the path that the murderer ran when he ran down the block, took several turns, ran around a giant park loop. The FBI drove that route to see what cell towers does someone hit when they are running that precise route in the Bronx. And the FBI agent said that there was a sequence of three cell towers Nelson used. First one for about two minutes, then another for about two minutes, and then another cell tower for two minutes. Does that happen even if he's not using his phone? He has to use his phone, and in the video, Judge, he is using his phone. You can see the murderer pull his phone out as he's running on the phone, and then he's texting on it later on in the video. So you know the murderer is using his phone, you know the route he took, and the FBI essentially used their technology to retrace that route with their monitor and see, what cell tower am I hitting as I'm running the same route as this bearded man? And exactly to a T, there is a unique signature, which also, because of the unique elevation in the area, the FBI agent said, this is really the only area in the Bronx, because of the elevation changes, where you see this kind of sequence of these three cell towers, because they're in kind of different locations in the Bronx. It was a precise match. So not only did a very close associate of Nelson look at that video and say, that is the defendant, that's Nelson, with certainty, but also that there is a unique cell site electronic signature that showed that that bearded man who matches Nelson's appearance in all material ways, including that big bushy beard, body type, facial structure. So that's the evidence that goes to the video. And lastly, Nelson dropped his phone, which he had been using for approximately, for months at least, 30 minutes after the murder, before the victim's families even knew that they were dead. So that, and this was clear in our summation. In the summation, we made clear that this is, it was really an electronic evidence case showing who actually killed the murderer. So regardless of anything else about the context. Wasn't there another person in the car with him beside Nelson? There was another person? Yes, there was an accomplice who was unidentified, Judge. You know who it was? The jury never knew. That's correct, Judge. No one was charged and the jury never knew. So that's the evidence of the murder. Guillermo Ortiz wasn't there. He can't testify to any of those facts. That was the core critical evidence of the murder. Why didn't you turn over the 3,500 materials sooner? So Judge, every violence case presents a safety concern. This one I would submit more than, than most. Two points on that. First of all, this is a double homicide where the evidence showed that one of the victims, Jennifer Rivera, was killed because she was a witness. That was the only reason she was killed. There were obviously extremely, extremely serious concerns about witness safety in this case beyond those even in the typical murder case. Also, there is discussion of this in the briefs. There was kind of acts of intimidation and taunting by Nelson towards another one of our cooperating witnesses, Guillermo Ortiz himself, whose statements are at issue. So very, very serious safety concerns. But nonetheless, that was the balance that was struck here. And the record shows, though, that it was sufficient time for the defense to review it. The defense counsel stated on the record the first day of trial he had reviewed these materials. They were produced, as the Court observed earlier, long before this witness testified. And for all those reasons, we assume that there was disclosure. If I could just address one other brief point. On the materiality point, it's not just Guillermo Ortiz's role in the murder evidence that is an important issue here. It's also the substance of these materials and the other impeachment information. Guillermo Ortiz testified about lying to a judge in court on a prior occasion. He said he had been drinking for hours at the time he observed this interaction. So there's ample impeachment evidence. And as Judge LaValle pointed out, whether or not Jasmine Guzman was in the car is kind of a whether the car that drove by was red or blue. It is not a central fact to this case or that interaction. And also Jasmine Guzman's statements. She said she wasn't sure whether Guillermo Ortiz was there or not. Her memory of this incident was clearly imperfect. And for that reason also, and also it's not even, she wasn't even in a position to perceive some of these events. When Nelson goes around the corner and makes a reference about people think I'm scared, Jasmine Guzman wasn't there for that. And it's unclear whether the interaction between Nelson and Rivera was simply through a driver's side window and a normal voice. It's not clear she would have even been in a position to perceive those facts. So in light of the role of Guillermo Ortiz in the murder evidence, in light of the other impeachment evidence for Guillermo Ortiz, and in light of the value of this impeachment evidence, which we would submit as frankly not significant, this was not material evidence. And more importantly, though, it was disclosed. I'd like to ask you a couple of questions about the double hearsay, the statements of Aunt Sandy reporting the statements of Jason, that he, several different statements by different witnesses, that he said he was going to collect money from Amaze or MZ or put in several different terms. Neither side has mentioned in any way in the briefing the Hillman Rule, which we relied on in very similar circumstances in the Persico case. Are you familiar with the Persico case or with the Hillman Rule? Judge, I did read the Persico case. I'm not sure exactly what the Hillman Rule is specifically. The Hillman Rule has to do with an exception to the hearsay rule when a person who is not available or has died made a statement of intention to go do something. In the Hillman case, it was that he was going to Kansas, I think, for some purpose. In the Persico case, if I remember correctly, it was the victim of the murder who had said that he was going to meet the defendant who was convicted of the murder. I was surprised that nobody briefed the Hillman Rule in Persico, and I wonder whether both sides might give us a letter about that. Of course, it would only cover Jason's statement. It wouldn't cover the hearsay of Aunt Sandy's statement, but it might at least cover one of those. I think we'd like you, both sides, to give us something in writing, maybe in a week. Can I do that within ten days? Yes, Judge, of course. Thank you. The second thing that I want to ask the government about is that you argue that this satisfies Rule 807, and Rule 807 requires that the statements have guarantees of trustworthiness equivalent to those that apply in Rule 803 and 804, and I have a little trouble seeing that that aspect of the rule is satisfied. My inclination on reading your brief was to think that you failed to convince me that that aspect of 807 was satisfied. I would have a hard time saying that the guarantees of trustworthiness, at least of what Aunt Sandy said, are equivalent to the guarantees of trustworthiness in the hearsay exceptions of 803 and 804, but I wonder whether that would matter because of the extraordinarily persuasive and overwhelming evidence that you were outlining earlier in your argument. I mean, if I had to, if this turned on whether 807 was satisfied, that seems to me to be a precarious position for the government. Anyway, what do you have to say about that? Yes, Your Honor, just a couple points. We do obviously argue the harmless error point in our brief, which I won't address again because I discussed the other evidence just earlier. I think I would make two points here. First of all, this is obviously an abusive discretion standard. We think that Judge Cote was within her discretion, and in terms of the trustworthiness, we think that this really was precisely the kind of hearsay statement that 807 was intended to capture. And Sandy's statement. Yes, and if I could also address, oh, I'm sorry, Judge. So, two points. If they're offered for the fact that Jason made the statements to her, then there's the separate question of Jason's statements being offered for the truth, what you're going to... Right, so the two layers. So, based on the defense brief, it doesn't appear that they are challenging. There's two layers of hearsay, but I think one is unchallenged. Your Honor, the Hillman Rule phrasing, it's not a phrase, I've not heard of the Hillman Rule, but I do, the statement of future intent, Jason said to Sandy, that's the first layer of hearsay, I'm going to go pick up money from a maze in substance. I don't believe the defense has challenged that in their brief. They challenged the 807 Rule. Judge Code admitted that first layer of hearsay as a statement of future intent. From what Your Honor described about that case, it seems like that's the same exception. So, I don't think that's the subject of the defendant's appeal, but in substance, stating what one is going to go do, who's going to... They're arguing, they're saying it's double hearsay, meaning that each of them was hearsay. A statement of future intention is another way of putting the Hillman Rule. Right, so Judge... That arguably covers the first. It doesn't cover the second. The defendant was objecting to double hearsay, which means both Jason's hearsay for the truth of the proposition that he was going to meet a maze, and Aunt Sandy's out-of-court statement that Jason said to her, I'm going to meet a maze. Yes, Judge. So, if I could address each of those chains in turn. Under the double hearsay rule of analysis, obviously, is one looks at each statement and then you need to make both links. The statement of future intent is a well-established, which I understand is called the Hillman Rule. Right, so I think that part of it, I don't think they challenged that link. That very likely covers equivalent to 803 and 804, and indeed, it may be subsumed in, included in 804. Right, and I think, actually, that first link, Judge Cote admitted that under 803, so that's not an 807 issue there. That's not... So, right, that's the second part of the statement. And here, you know, it's the statement that Aunt Sandy recounting these statements to a number of people, three cooperators, one civilian witness. These statements were made by Aunt Sandy immediately following the murder of her oldest daughter. She was deeply in grief. The statements were made to close friends and family members. You know the problem you have is that that's not the story she told the police. That's the problem you have with satisfying 807. Well, Judge, so on that point... I know you have the explanation that she would be more inclined to lie to the police, she was still protecting other criminal activity, whatever. But that's the question is, how can we say that 807 is satisfied when she's told inconsistent... when she's given inconsistent accounts? In this case, in light of who she was speaking to... I mean, and it's not just an explanation, I think it's a robust one. This court has found in the past that statements to the police are less trustworthy. Like, there are incentives to lie that arise in those circumstances that don't arise when one is speaking... when there are non-testimonial statements and one's speaking to co-conspirators, to close family members and that sort of thing. So it's actually the statements to the police under this court's jurisprudence that are the least trustworthy because of that incentive to lie. It is when one is among one's co-conspirators or close family members where that concern about being candid is significantly lessened. And that's... And it's not just that kind of who one was speaking to, it's when. This woman was deep in the throes of grief. This was established in the testimony. Her oldest daughter had just died. She had absolutely no reason to lie to her close friends and family member about what immediately preceded their death. There was absolutely no reason to fabricate. And in terms of what the hearsay was concerned about, it's, of course, fabrication, whether someone could perceive it and so forth. She was in a position to perceive the statements. She was the one talking to Jason Rivera. This had happened only 24 hours before. It was her last conversation with her family members before they were brutally murdered. And when she was talking to these co-operators and they were grieving, they were literally on the way to or at the funeral. I think it's hard to think... I mean, we talk about how this is close to other hearsay exceptions. The excited utterance one, it's difficult for one to imagine a circumstance where one's kind of... so emotionally vulnerable, and just speaking from the heart or from the mind, is when you are at the funeral of your own child. Is that really a circumstance where one is going to deliberately fabricate information about what the last thing they said to you was? Of course not. And that's precisely what 807 is meant to deal with. This has the exact same guarantees as an excited utterance statement in light of a mother's grief. And in terms of the police statement again, you know, the police statement itself makes clear that this was a pretty hostile interview. There were statements where she was... How long after the murder was the police statement? The police statement was the next day, Judge. It says about a week later. I think... I believe that there was two. There was a first statement, I think, the day after, and then there was another statement a week later. But the... The funeral in between, right? Yes, Judge, that's correct. The statements to Vanessa Clark, for example, were just one or two days after the murder. The statements to Michael Ortiz were also shortly afterwards. But the point is, it's the circumstances in which Sandy... I don't think the court could have concerns based on these circumstances that Sandy's lying, is making this up. There's absolutely no reason to do it. And based on her emotional state, this is just not something someone's going to fabricate under those circumstances. In terms of the perception issue, the ability to perceive accurately, again, it was a conversation that she had with this individual, and it's to a close family member. So there's... The concerns that the hearsay rule looks to, none of them... None of them are implicated by Sandy's statements to the cooperating witnesses. And in addition to the excited utterance exception, these statements are also similar to some other kind of hearsay exceptions. One, there's evidence in the record that Sandy had stored drugs and guns for members of the conspiracy. They have some of the hallmarks of co-conspirator statements. And there's the trustworthiness that comes along with that. When one is, you know, speaking among thieves, there's a certain honesty that comes from that. And that does not emerge when one is speaking to law enforcement, when you yourself have kind of been assisting the conspiracy, including in debt collection. And also there's a degree of a statement of kind of against penal interest here. Sandy Rivera was part of the efforts to collect this debt money. That's another critical reason why the statements to the police... You know, I think those statements... There's a very good explanation for why she held that information back. She was part of the debt collection efforts, the debt collection efforts that led to this murder. And she also told the police that Jason Rivera was no longer... What did she do as part of the debt collection efforts? I'm sorry, Judge? What did she do as part of... What did she do that supports your argument that she was a co-conspirator, and this was a statement among co-conspirators in furtherance of the conspiracy? She was involved in... The record shows that she was involved in kind of... She was kind of an information centre between Sambula, who was in jail, and Jason Rivera and other people who were out of jail. So she would kind of speak to Sambula in jail and provide information to those who were out of jail and collecting on these drug debts. So not only has she stored drugs and guns for members of this conspiracy, but she was also helping them to collect drug debt at this time, which is what led to these murders. And she told the police Jason... You're arguing that this was a statement in furtherance of the conspiracy by a co-conspirator. Judge, I think that... I mean, that was not argued at trial, and I think there are reasons... So that was not argued at trial, but it certainly has... It certainly is very... It's certainly similar to the rationales of why that sort of... that sort of statement is... What reason is there why it is not? What argues against its being a statement by a co-conspirator in furtherance of the conspiracy? Judge, as I say it, I almost wish we had argued it. I think it didn't occur to us, but I think the facts, frankly, as we've talked through it, there is a good argument that that would be the case. There was finding on the record that a Ray Nelson, the defendant, was in the same drug conspiracy as Jason Rivera. That part, was the jury told that she was part of the collection efforts? Judge, I believe that's the case. I would have to check the record, though. I don't want to make that representation without looking at the record. I believe that's the case, but I would want to confirm. So for all these reasons... But, Judge, even if the court were to find that that exception did not fully apply, because perhaps she was attenuated from Nelson, you know, I think there are cases, especially in the mafia context, where this Court has held that, you know, even when there's a mafia war, an internal war, and people are at odds, I mean, certainly Sandy Rivera would not have viewed herself as being, you know, allied with Nelson, that even when there's a dispute internally, there are statements, it's still about the war and resolving conflicts and collecting debts to make the enterprise go forward. Those still can be co-conspirator statements. But the critical... The letter that both sides are going to give us expand beyond just the applicability of the Hillman rule, but also to further briefing on the entire aspect of the Sandy... Yes, Judge. Absolutely. Thank you. Still ten days. I have one other question, if I may. Yes, Judge. Which is, the video... I think you slightly oversold your recap of how powerful the evidence was in saying that the video surveillance and all that shows that he was the murderer, because there were two people in the car. Another one was apparently a confederate of Nelson, and they both fled. So was... The video shows which door of the car Nelson fled from. Was it the door that was directly behind Jason? So, Judge, the evidence at that point, I think the video evidence actually definitively shows that the man with the beard, Nelson, was the murderer. Shows him inside the car shooting? So I want to be careful and walk through this in detail. I don't mean to think up too much more of the court's time, but I do think it's important to kind of explain the details here. There's a number of videos from this area, and there is a video... The murder happens inside the car, and one can actually see the muzzle flashes. There were three shots in this case.  and Jason Rivera was shot once, I believe, is what the ballistics showed. You can see the individual who's not Nelson. Their door has already opened, and they're getting out of the car. The accomplice. The accomplice is getting out of the car already. While the muzzle is still... Right, while the muzzle flashes are occurring still inside the car. And so it's the muzzle flash in the video that definitively shows the bearded man, Nelson, was the murderer. Was he right behind the driver's seat? That is what the video evidence shows. Yes, because the accomplice got out of the passenger seat rear of the vehicle, and Nelson then kind of fled, I think it was north, and then around this circular park, and that's the path that the FBI drove to simulate a cell phone to see. Did you neither charge the accomplice nor had him testify as a cooperator? Judge, the accomplice was not charged, and there is no evidence about the identity in the record at trial. But it's really, Judge, and I hope that addresses the court's question. I'm happy to go into more... All three gun flashes happened after the accomplice is already moving out of the car? Judge, my recollection of the video is I believe all three. I mean, certainly the last one or two. I believe that what's happening is the rear passenger side door is opening, and you can see that, and you'll start to get out as the flashes occur. So I don't want to... I'd like to check the video, but at least some of them are occurring. I'll put it this way. I think it was very clear based on the video that it would be physically impossible for the accomplice to have been the one who actually fired the gun in light of the muzzle flash evidence. All right, this will be a good place to end. Thank you very much. Thank you, Judge. Mr. Mintz, I know it's been a long time. You reserve three minutes for rebuttal. The reason they didn't send over the 3500 materials sooner, counsel tells me, is because they were worried about the safety of cooperating witnesses. Does that satisfy you? No. Just saying. Not even close, and I'm taking a deep breath. First, I would like to ask the government, myself, if the court would accept a submission of the video evidence, because I wholeheartedly dispute the government's characterization. Well, we're not finders of fact, as you know, and this went before. I understand, Your Honor, but the government just stood here for I think it was 16 minutes saying that the video shows the murderer was the defendant, and that is not what the video shows. The video shows someone leaving the car. That person was identified as my client, but it does not show the murder, and there is no definitive . . . Was it muzzle flashes or no? It shows something that their expert identified as muzzle flashes. I watched the video, but you need to understand that it . . . Okay, so if the video shows muzzle flashes going on while someone else or someone is exiting the car, the reasonable inference would be that someone else is in the car firing, and they say that when that person exits the car, he's got a full beard and is built akin to your client, and that that's the person whose movements are traced in a way that parallel your client's cell phone use. What parts of that do you disagree with? I disagree with the characterization that the murderer was the defendant. Well, that's the conclusion they're saying . . . Understood. . . . so powerfully compelled by this evidence, but what part of the evidence do you disagree with? Let's start with that. Okay, so let's talk about an alternative situation, which is let's say . . . What we're really interested in, because you asked us to look at the video, what parts of how they've characterized the video, not the conclusion they draw from it, but what they say is on it, do you say we wouldn't see? Because what I dispute is they seem to . . . I don't want you to get the impression that if you look at that video, you can actually see the person that they say is my client running away, that you can actually see them pulling the trigger. I don't think they did suggest that. They say . . . Well, he . . . The puzzle flash is somebody else is already out of the car, so somebody's in the car, and that person, when he gets out of the car, they're saying it can be inferred as your client from all the tracking that they do. Right. So let's say my client was there. Let's say, even if I wanted to concede that, let's say that my client was there, that he met up with Jason that night. In the car? Your client was in the car? Well, let's say according to the tracking information, they were in the same place. Let's say I stop disputing that, which I don't, but hypothetically, if I do. That in and of itself is not evidence, I think, to convince a jury. So how does the government push that over the edge to get the jury to say, okay, this was, you know, Nelson who murdered him? Well, that is Guillermo Ortiz, and that is Jason's threat to my client, which Guillermo Ortiz is the only person who talks about. And that's why the government says in their opening statement, if the defendant didn't pay up, the guns would come out. So what does the defendant do? He makes a decision, I'm going to get Jason before he gets me. Then they close with their summation, the confrontation over the drug debt earlier. You know the defendant had a motive. Then in rebuttal, you know about the motive. You heard about the threat of violence. This was not, the allegation here was not that my client killed Jason to avoid paying him the money. It was that he killed him because of that threat. So . . . Who was the witness who testified that it looked like your client getting out of the car by body build, by the . . . Jonathan Sambula. So that was not Guillermo Ortiz. It was not Guillermo Ortiz. Sambula was, unless I'm mistaken, the first cooperator to testify. And that's another reason I think that the Ortiz breeding material may have gone unnoticed because they were so focused on Sambula at that point. Because Sambula did provide a much broader spectrum of evidence. He was talking about a lot more things. Doesn't that undercut your case though? I'm sorry? Doesn't that undercut your case? Absolutely not. Had the government either given the Ortiz information sooner or at least identified it to the defense and said, hey, these documents are significantly impeaching of the story he's going to tell at trial. You should look at them. I don't think we would be in this situation. As to 807 . . . . . . And that's why he's so crucial. Yes, he's the only witness that does that. He explains what the meeting was about. He gives what the government has described time and again as the motive. And the reason he is so critical is because nothing corroborates what he says about that except himself, which is also the same problem with this death threat testimony that was never noticed in advance. It comes out of nowhere, and the only thing that corroborates the fact that it even happened is Ortiz saying so. There's no record of it. There's nothing. This witness gave two critical pieces of information for the government to base its case on, and there is nothing which backs it up. And the things that undermine his credibility were held until the last minute and then not identified. And this is an office that . . . I'm assuming the panel has seen my motion that was granted about the judicial notice. This is an office that has admitted that they had a Brady problem, and that was in a case related to this one. Same unit, same overall investigation, I believe. They failed to identify things that should have been . . . Let me ask you this. Yeah. Why does the government have to disclose material that impeaches a witness before they've committed to putting the witness on the stand? How is it material to anything? I mean, this is a constant discussion with respect to the government's when they arise, because a witness may abscond. A witness may die. The government may choose not to put on the witness, in which point the fact that he can be impeached is not material. And so that is the underpinning for some of the precedent that suggests that as long as it's turned over as 3500 material, the government has generally satisfied its obligations. How do you have a different argument here? Okay. So first of all, the case that the government relies on is Douglas. This is, of course, a decision in Douglas. Douglas is a very different case than this. I would argue that we are much closer . . . What's the support that you're entitled to impeachment material? My . . . Well, so when would . . . I mean, the reason . . . If that is the . . . The government's 3500 obligation doesn't arise by statute until the witness has finished his direct examination. Right. But no district court in the circuit, I think, allows the government to wait that long, and precisely so that counsel will not have a complaint that he wasn't given the material in a timely manner. So I'm just hard-pressed to come back to our very first point. You got it five days before trial, 11 days before cross-examination. How do you think you even have a Brady-Jiglio claim that you were entitled to it any time sooner? Well, I think that that would lead to the conclusion that there can . . . that there is no Brady right to impeachment material. There is. It's just a question of . . . With respect to a witness, the person has to be clearly a witness. Yeah, but . . . And there has to be an inconsistency. That's what makes the material . . . That's what makes the documents you're going to get material. Right. And the material, material . . . Yeah. If that's the case, though, you know, that would . . . That rule would lead to incredible problems. I mean, what if the government doesn't decide until day three that they're going to call a witness and then they turn over a bunch of information? What is . . . You ask for more time and the district court is going to give it to you and be very perturbed with the government. But I don't think that's reasonable, Judge, because now you're . . . Let's deal with this case. Right. So the government . . . Again, I wasn't trial counsel. I don't know. I'm looking at this record. I don't see how there was ever a question in their mind they were calling this witness, ever. They needed him to supply the crucial fact. They needed him to supply the crucial fact and they needed him to get this death threat in, which again, I have tremendous problems with that death threat testimony. But there was no question he was going to testify. There was no question he was going to testify to the extent that the defense made this in limine motion, asking for his Brady material. I mean, that's how sure the defense was at that time. On that theory, the defense could ask for every Confederate and sometimes for less than responsible purposes. Understood. But the defense didn't ask for everybody. Right. They were keyed in on this one person. So I don't think it would be . . . I don't think you can draw a conclusion here that the government wasn't sure at any point that this witness was going to testify. And again, anyone looking at this first statement where he says, I was in the car when he testifies to trial, I was not at the car, anyone looking at that would have known that that has such impeachment value that it has to fall under Brady. And even if they weren't sure, they should have turned it over out of an abundance of caution. I mean, that's the DOJ guideline on that. So it just . . . I don't see how anyone could have looked at this situation and not turned it over, and we see the result, which is that the defense did not use this at all. And there is no way to conclude that that was a tactical decision on this record. Thank you. Thank you, Judge. Thank you both. May I just add that in the letter that you give us, would the government include any record citations that support the proposition that Sandy was involved as a member of the conspiracy, and that the statement by Sandy was in furtherance of the conspiracy? Yes, Judge. You both respond within 10 days at the same time. Thank you very much.